May it please the Court, and congratulations, Your Honor. Thank you. My name is Tanya Morrow, and I'm representing Bill Wieland. And he seeks your – excuse me, his release from incarceration because we believe in his case the State failed to present substantial evidence to disprove his innocence. And that's where we start, of course. The State didn't prove a very key element of this offense, the aggravated murder, and that was what the decedent knew about whether Wieland committed arson with regard to the house fire that preceded her death. In fact, the State's evidence actually contradicted its theory about that element and what she knew about whether Wieland committed that arson. She told the insurance investigator within a day or two after that fire that if anybody in the family was responsible, it was her granddaughter Jody. Counsel, which fire? This was the third fire. This was the house – what I call the house fire. It's the one that actually did destroy the house. Yes, okay. Sorry. So, and as the Court is aware, we argue and we've put forward that the whole due process violation of the failure to meet the Jackson test actually began when the State wrongfully, in our view, demanded the admission of the 1991 fire's evidence and the 1984 fire's evidence. And the reason they did so, it's clear, is that was the only way they could offer a comprehensible story about Kimbrel's murder, about the decedent's murder. The case was cold, at least 6 years, a little longer by the time it got – it was tried, and they could not articulate a comprehensible story without essentially saying, Mr. Wieland, we've learned subsequently since 1991 that Mr. Wieland was a bad person because he was associated with these fires, and therefore, there's a probability, in our view, that he committed the murder. Now, I'm aware that the district court, when ruling on the motion for judgment of acquittal, specifically said that he believed that Mr. Wieland – there was sufficient evidence that Mr. Wieland committed the House fire, the 86 fire, without consideration of the 91 fires. I don't believe this Court, even under its double deference under AEDPA, has to take that at face value. I think the district court did, and it swayed the district court from really looking at what those facts were. In fact, when we look at those facts, the court – the district court even adopted and suggested that one of the basis for the trial court's denial of that motion was that there was no viable – other viable reason that the decedent would have been killed. And again, that's putting the cart before the horse, which is what happened when we allowed the 91 fires evidence to come in. It allowed the court to rely on the probabilities that Mr. Wieland committed the arson and committed the subsequent murder. And that's why we've got a problem here. That violates the Jackson rule that we can't have speculation involved in criminal convictions, and it also violates the prior rule announced in Victor v. Nebraska, which specifically addresses the doctrine of chances and says, this is – this is not the standard for sufficiency in this country. You can't rely on probabilities. So not only did the State's evidence contradict a major – a major element, it also wasn't sufficient to prove that he committed the 86th arson, we believe. And I can take a look real quickly at four of those nine – nine factors that the State argued before the motion for judgment of acquittal. And the first one was – and how they don't – they don't satisfy the standard in and of themselves. The first one was that the decedent had a plan to catch the arsonist, which was shared with Petitioner. Well, we have demonstrated in a brief that that – that she had a plan, she had several plans, and that she shared them with more than just the Petitioner. Maybe she didn't share them with her grandson and her granddaughter, who were potentially the arsonists in the case. But it doesn't give us the identity of the perpetrator of the third fire, the house fire. Well, let me ask you this. You think the State was required to prove that he committed the – there's so many fires, I get them mixed up – but the one that almost killed the wife and kids, right? I think there's no dispute that he was – they were required to demonstrate that he committed arson in 86, before her – before her kids. Okay. But that's where I'm confused. Why do they have to prove that he actually committed it, as opposed to just that the mother-in-law suspected that he did? I thought that was all that was needed for the State to convict on this. I mean, he's ultimately convicted of a murder, not of committing an arson, right? That's – So why isn't it enough that they put on evidence from which a reasonable jury could say, you know what, we don't know – no one's ever going to know who actually committed that particular arson. But one thing we can figure out is that the mother-in-law thought it was him, and he knew that she thought it was him. And that's enough to go forward on the murder charge. Well, because under State law, under Gardner, in order for the State to reach this point, the evidence is such that the State's got to prove that the prior offense occurred. In the case of Gardner, the Court upheld the conviction and found that the evidence was sufficient because there was evidence that the murder victim had substantial information that the defendant had committed the prior crime. This is about murder with regard to the – for the reason of preventing the disclosure of identity of the prior crime. So I don't believe under Oregon law it's sufficient just – And they took – the State – it looks like the State accepted that duty or obligation, and they put on evidence that he – They did. I don't think there's any dispute that the defendant did do that. Right. They did. And I don't see why there isn't enough evidence for a reasonable jury to conclude that he committed the prior. I'm sorry? I said I don't see why there isn't enough evidence under the Jackson standard for a reasonable jury to conclude that he did commit the prior murder. Well, if we look at what the evidence was, there's – I just mentioned that. And, you know, we're talking about Jackson, and then we're talking about whether it was unreasonable for the State court to conclude that there wasn't a Jackson violation.  So it's a double deference. I agree. And we're taking that on. I don't have a problem with that at all. And this is one of the most egregious cases, I believe. And I don't think the Court is stuck with accepting the trial court's decision, because we look at the trial court's  One – You're talking about the State court's decision. Yes, excuse me, the trial court's decision. The State court's ruling on the – On the motion. On the motion for acquittal. Right. Right. Again, setting aside the one element about what the decedent thought about the perpetrator of the fire, setting aside what she thought about Wheeling, which I'm saying, the State's evidence contradicted its theory. Therein, I mean, the trial court didn't address that factor. All it did address was, oh, I believe there's sufficient evidence to prove that he committed the arson in 86, the fire at the house, the third fire primarily. Those four factors, as summarized by the district court, from the argument the State made were that she had a plan to catch the perpetrator. She disclosed to the Petitioner. She was aware of his unemotional responses to the fires. I'm going to come back to that. The third one was that she knew that he was always in the barn when the fires occurred. And the fourth one was that he knew the floor plan of the house. Those aren't sufficient facts. In the context of the rest of the evidence, and we don't get to Jackson's standard without looking at the context of the rest of the evidence. You don't get to make an inference when the inference is irrational in the context of the other evidence. In the going back now to his unemotional responses, we've demonstrated there was absolutely no evidence of this. The main issue, as far as his responses, had to do with the last fire, the house fire. And both his wife, as well as the fire chief, Albin, said that he was stunned and dazed. And we've cited the record where, you  know, it shows that Kimbrell, the decedent, was there and present at the time that Mr. Whelan talked to Mr. Albin, the fire chief. So that's evidence that she would have seen that he was stunned and dazed. She knew him. The State's evidence was merely that the passersby that assisted in rescuing Mrs. Whelan and the children from the house thought his responses were unemotional. You can't look at that as a rational inference in light of the rest of the evidence. It says nothing. There's no evidence that they shared their view with Ms. Kimbrell. There's no evidence that she had any idea that the Johnsons thought he was unemotional and detached. The other evidence of his seemingly unresponsiveness had to do with the attic fire. That was the first fire. And again, the State's view is, well, there's a person up on the roof that was putting out this fire who watched him from the milking parlor, and there's no evidence that he shared that with anybody prior to this trial eight years later. There's no evidence that one of his companions who had assisted in the fire actually shared with anybody the fact that Mr. Whelan came out of the barn where he – where the other passerby had parked his vehicle and complained about the disturbing the cows. So there's no evidence that she had any of that information. Let me ask you just – I want you just to address one point in the – before you sit down, and it's this. Procedurally, the district court determined that – or the State argued that the Jackson claim was procedurally barred, and the district court rejected that argument. Do you have any – I mean, is the district court correct? Yes, absolutely. Why? Because the Oregon standard is identical. There's no question that the Oregon issue about whether the Jackson sufficiency test was resolved by the Oregon courts. There's just no question about that. And that's enough. We don't – you don't have to put in Jackson. We don't have to put in due process. We really don't. That's not the standard. That's putting form over substance, and we cited some case law with regard to that. So unlike the State's position that there may be some question, like in the Nevada case that I believe it was that was recently raised, Nevada does have a different standard. There's no substantively different standard in Oregon. Okay. Thank you. Thank you. May it please the Court, Patrick Ebbert, for the Respondent, Frank Thompson. So I'll just jump in. Sorry to cut off whatever you were going to say. But so is your opponent right that you, in order to sustain the murder conviction, you, the State, had to prove that he was the actual perpetrator of the, I guess, the 86th fire? I don't have the dates straight, but you know that fire I'm talking about. Certainly, the way it was indicted, it was – his participation in the arsons was critical evidence for the State, because it was indicted as he needs to – he murdered her to conceal his identity as the arsonist. Whether that arson needs to be proved beyond reasonable doubt or by preponderance of the evidence, I don't think really matters. But certainly, there needed to be compelling evidence that he committed the arsons. Okay. And what – just run through your case on – Or one of the arsons, I should say. Well, no. Okay. Well, one of the arsons? Well, I mean, he needed – there needed to be evidence that he was concealing his identity as an arsonist. So the State needed – there needed to be evidence that he committed an arson. Arson. Okay. So that's why I was confused. So it's not the 86th one necessarily? Sorry? So it's not necessarily that he committed the 86th arson? Well, I think it needs to be the 86th arson. I'm sorry. I shouldn't use the dates. The one that almost killed the wife and kids. It doesn't have to be that particular arson, but I think the evidence that he committed that arson is the most compelling. Oh, okay. So run through the evidence on that one, then. Okay. This is the June 22nd house fire. The first piece of evidence is that the victim and Petitioner's wife had concocted a plan to catch the arsonist, given that the prior two arsons had occurred on a Monday morning. The victim agreed that she would sleep on the couch that Sunday evening in an effort to catch the arsonist the following Monday morning. Yet that plan was shared with Petitioner, and yet that plan was foiled because the arson occurred that very Sunday morning. That leads to an inference, reasonable inference that the arsonist knew of this plan. On top of that, you have Petitioner's wife, Cindy, her bedroom door was uncharacteristically closed. The arsonist knew the floor plan of the house. The fire was unquestionably set. Hang on. Hang on. This is the fire that nobody disputes was intentionally set, right? Correct. Okay. So what does the floor plan of the house have to do with that? Tell me again. Remind me again. Hang on. Hang on. Just remind me again. How did this one start? Was it the one that was started in the drawer? It was started in the living room on a stack of boxes that were inside the living room. Okay. And so why did the arsonist need to know the floor plan of the house to set that? It seems pretty straightforward if you want to burn down the house. I honestly don't exactly recall why the fire investigators came to that conclusion, but that's the conclusion that they testified to. That whoever did it knew the floor plan of the house? Yes. There was also Petitioner's response to the fires. Despite his family's near-death experience, the passerby noted that he was unemotional in response. Instead of going to the hospital along with his injured wife, he went back to the barn. Petitioner asks us to discredit that testimony, but that reflects a failure to do so to recognize the appropriate standard of review under Jackson. The appropriate standard of review under Jackson is whether, viewing the evidence in the light most favorable to the State, a rational juror could find the Petitioner  And then, of course, the public. That just doesn't sound like a terribly compelling case to me. I mean, you haven't – that's all you got on the house fire? Well, no, we also have – we also have motive. He obviously had motive, and he wanted to replace the house, and by burning down and collecting insurance money, he was thereby financing the building of a new house. We also have the fact that the doors were characteristically locked in response to his concern about fires. Petitioner had a key. And finally, we have the denials of Petitioner's wife, Cindy, and his daughter, Jody. They denied, in their testimony, that they were – they committed – that they had anything to do with these arsons. That reduces the frame – the number of people that we could be culpable to, essentially one, and that's Petitioner. Counsel, I recall from the record there was a testimony by an associate of the Petitioner's, and they were talking about getting paid for a house burning down, like $600 or something like that? Yes. That was – I think that was in reference to the 1984 barn fire. Okay. Would you argue that that's part of your – part of the analysis as well? I think it needs to be, no, no. And I – no, I don't think that needs to be part of the analysis, no. Am I remembering right that there was evidence that the Petitioner said to someone, the house is next? He said that in relation to the – yes. After the 1984 barn fire, he did say that, yes. Okay. Well, doesn't that help your case? It's certainly compelling evidence, yes. I mean, I think – yeah. Well, I just – I don't know why – I can't place where that came from, but it's – I'm just surprised that you wouldn't go there first. That was my question as well. It would seem that that – if someone is telling someone you can make money essentially by burning down houses, and then he says the house is next, and then in 1986 there's a fire, it seems to me that is stronger evidence than that someone may have known where the boxes were in the house. But you – I think – I mean, I didn't think it was particularly necessary. I think it's certainly helpful. I'm trying to figure out – no, in all honesty, I'm trying to figure out why you didn't just lead with that. That seems like the most compelling – much more compelling than any of that stuff you just ran through five minutes ago. So is there some – is there some problem with that testimony? Because I have only a vague recollection of it. It's sort of – out of abundance of caution, I think, on my part, was that the evidence of the 1984 and 1991 fires, the fires themselves, was admitted for a limited purpose. The jury was instructed they could only use the evidence of those fires, the fires themselves, to find that the fires that occurred in 1986 were not accidental, A, and, B, that the fires that occurred in 1986 may have been caused by a member of Petitioner's family. I mean, I don't want to argue you out of your own evidence here, but wouldn't the comments in 1984 where he says the House is next go to show that what happened in 1986 was not an accident? Yes. It certainly would. And I think it's admissible for that purpose because, of course, the limiting instruction was only limited to the fires themselves, not his reaction to them. But I was just – out of abundance of caution, sort of steering clear of that stuff because I didn't think I needed to, but certainly it's helpful. Anyway, I think the essential problem with Petitioner's arguments is they really essentially ask this Court to view the evidence in a light most favorable to the Petitioner. We see it time and again in the briefing. We heard a little bit of it in the arguments just now. For example, Petitioner suggests that Petitioner's daughter, Jody, is a possible arson suspect. But, of course, to make that suggestion, he ignores Jody's testimony denying her involvement in any of the fires. Under the appropriate standard of review, you have to credit that testimony. He asks that the testimony from the young stablehand Jeff Starr, who witnessed the disagreements between the tension – and tension between Petitioner and Jody, the victim, he asks that that testimony be discredited. That's not the appropriate standard of review. There's a number of other examples. The standard of review is Jackson, and then, of course, on top of Jackson, you have Edpard, in which you have to prove that the trial's court – you don't have to necessarily agree with the trial court's determination. The standard of review is whether any fair-minded jurist could find that the trial court reason – could find – could reasonably find that a rational juror could conclude that Petitioner was guilty. You know, the – one of the other elements that had to be presented to the jury was evidence that Kimbrough, the victim, suspected or knew or believed that Weiland was. She – that is not an element of the offense. Pardon? What she stated did not need to prove her actual knowledge. That is not an element of the offense. There's two – there's two elements to aggravated murder as instructed in this case – I mean, as indicted in this case. One, that Petitioner murdered the victim, and two, he did so to conceal his identity as the arsonist. The mental state is his. There's no requirement that she have a particular mental state. Certainly, the evidence that she knew is helpful to the State because, to the extent it suggests that he knew that she knew, and that would motivate his – his – in evidence of his motive, which is the basis of the aggravating factor. But the State did not need to prove that she actually knew. Just to give a hypothetical. Let's – for example, let's say you have a bank robbery. That's a much – well, how about just suspect? I'm sorry? Suspect, yeah. I mean, he – that she suspected, and I think what the State needed to prove was that he, at a minimum, that he feared that she suspected that she knew she was the – that she knew he was the arsonist, or that he feared that she might, if not already on – not already being on to him, might be on to him soon. That's all that State needed to prove. They did not need to prove – the State did not need to prove that she had a particular mental state. Okay. Did you want to address at all in your remaining time the exhaustion arguments? I don't – I don't want to cut you short on what I'll call the merits of the case, but I also don't want you to miss out the opportunity to talk about that issue as well. Well, I'll happily just briefly make a couple of comments. I mean, just sort of a few basic points I want to make. Here, Petitioner raised the Jackson claim in trial court and described – and a State claim, and he described the two standards as being slightly different. In the appellate courts, he abandoned his Jackson claim and only raised a State claim. In fact, in the court of appeals, he cited three cases. Two cases, Krumacher and Zauner, predated Jackson. They were State cases that predated Jackson. One was 1968, and Krumacher was 1974. And he also cited a court of appeals decision, Cervantes, which made no reference to Jackson, the Jackson standard, or even recited anything that looked like the Jackson standard. How is – how can a Petitioner alert a trial court, an appellate court, that he's raising a Federal claim when he cites only cases that don't cite the Jackson standard, and two of which predate the Jackson standard? But in the district court's order, the Federal district court's order, it stated the State agreed that the standard between Oregon and the Federal were the same. Is that still the case? Yes. Certainly, under current law, the two standards, the Oregon courts have said the standards are equivalent, yes. So if that's the case, then how would the State, in a sense, be prejudiced if instead of saying H2O, it said water, which is one way you can look at this? How is the State prejudiced? I do think, candidly, I think this is somewhat of a – it is kind of a formalistic requirement. But I think that's – I mean, certainly this Court, in Del Papa, the Nevada case that I cited in my 28-J letter, was the State required to show any particular prejudice? No. But the Court – this Court has held that they must alert the State courts to the Federal nature of their claim. Did he petition for review with the Oregon Supreme Court? He did. He didn't cite – He did not cite Jackson. He cited Cervantes. The Supreme Court case in Cervantes, Cervantes after it arrived in the Supreme Court, but Cervantes didn't cite Jackson either. It did use language similar to Jackson. Doesn't it give the same standard as Jackson, though? That's what I understand. It does give the same standard as Jackson. I thought that that's what you were – that the State basically – why the State basically agreed that the standards were the same. I mean, I thought that's why the State agreed that the standards were the same. Were the same. Or are they the same? The standards are the same. I think that's probably – I think that's true of any – in any sufficiency case, the standards are going to be essentially the same. It's whether there's evidence from which a rational observer could infer, could conclude that the elements of the offense have been proved beyond reasonable doubt. However you particularly word it, I think the standards are all going to be generally the same. Not always. I mean, certainly in most – I mean, certainly in other areas of law, we have case laws. Right. I'm saying, looking, for example, at the Nevada standard that Petitioner quotes in her response to my 20HA letter, there it looks an awfully lot like the Jackson claim. I mean, it's not worded identically, but as a practical matter, I would think it would function just the same. Yet this Court found that wasn't sufficient. Do you see any reason why, if we were to agree with you on the merits – that's obviously a big if – do you see why under 2254b2 we could not reach the merits of the case and not decide the exhaustion issue? Yes. Certainly this Court has done that in the past, has gone ahead and decided – and just sort of, I mean, reserved the – and not reached the exhaustion issue because it didn't feel that the State prevailed on the merits. I think in Lacey, is there a case out of Oregon in which this Court did precisely that? I'm almost out of time. I just – Actually, you are out of time. Oh, I am. I say that I am. Unless the Court has any further questions, that is all I have. Thank you very much. Thank you very much. I'd run through this briefly. With regard to the last issue again, the State's position in a way is hyper-technical. What they're trying to say is, hey, the trial – the trial counsel referenced the State statute. We pointed out that the State statute has no substantive standard in it. It's just the process. And then, well, and then it must have been tactical when they didn't cite Jackson in the appeals court. It's not tactical. Well, we at least – because we had two different – we had two different attorneys. I think that's important if you're going to even consider that argument the State makes. I don't think there's any question that the Nevada standard is way different as far as the language than the Jackson standard. And whatever it's worth, Nevada still references the Edwards case. And so there is a question in that case as to whether or not they did abandon a Federal claim because they only cited the State. Here, there's no question, same standard. With regard to the evidence regarding the $600 to burn down the barn, the background is, is that that information didn't come out until after Kimbrell was dead. This farmhand had only said that after her death. And the context was broader. They were both renovating the barn. And there was always an intent to tear down the yellow house. In fact, Mrs. Whelan had boxes still of all of her heirlooms in that house that were burned in that fire because they were going to build a dream home. Well, they ended up building a mother-in-law cottage for the mother-in-law Kimbrell first. But there was always a plan to tear down that house. And in fact, when they – Was the house is going to be burned down next? No, it wasn't. It just said the house was next. And so there was always – there was going to be a renovation to the house as well. That was all it was, is that there was – there was – the house is next. And with regard to the potential for fire on that is, when they finally decided it was time to start building the dream house, they had actually decided they were going to donate the house to the fire department for it to be burned down. And in the meantime, we have – we have, you know, the drawer – the bathroom drawer being set on fire and some discussion about whether the daughter was really not happy there. I think I have one last thing. I've got a couple of seconds here. I don't think there's any question that under the State law, you know, they had to at least prove that she suspected Mr. Whelan. And you can't get to an inference that Mr. Whelan, you know, wanted to kill her to evidence that she suspected him in the first place. That's a predicate in order to get to that last – that last element. And again, you talk – you look at the Gardner case, it said in that case, there was evidence that the murder victim had substantial information that the defendant had committed the prior crime of drug distribution. That's our standard in Oregon. Finally, with regard to whether Mr. Whelan ever thought Jody did it, he didn't. And there's some discussion of that at my – in the reply at page 22. I think that's it. Thank you. Roberts. Thank you very much. Very interesting case. The matter is submitted, and we appreciate your arguments. Very helpful.
judges: PAEZ, WATFORD, OWENS